## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**BALKAN ENERGY LIMITED, et al.,**                      )
)
    **Petitioners,**                      )
)
        **v.**                      )      **Case No. 17-cv-00584 (APM)**
)
**REPUBLIC OF GHANA,**                      )
)
    **Respondent.**                      )
_____ )

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Petitioners Balkan Energy Limited ("Balkan UK") and Balkan Energy (Ghana) Limited ("Balkan Ghana") bring this action to enforce a 2014 foreign arbitral award returned against Respondent Republic of Ghana ("Respondent" or "Ghana") by the Permanent Court of Arbitration at The Hague, Netherlands. Balkan Ghana was awarded $11.75 million plus costs and interest. Petitioners now seek to confirm the award under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201, *et seq.*, which codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention").

For the reasons that follow, the court grants the Petition to Confirm the Arbitral Award as to Balkan UK and denies Ghana's Motion to Dismiss the Petition.

## II.    BACKGROUND

### A.    Factual Background

Faced with a severe power shortage in 2007, Ghana negotiated with Balkan Energy LLC, a company based in Texas, for the refurbishment and commissioning of the Osagyefo Barge, an

unused power barge located in the Western Region of Ghana. Pet. to Confirm Arbitral Award, ECF No. 1 [hereinafter Pet.], ¶¶ 15–16. In order to carry out the project, and as required by Ghana law, Balkan Energy LLC formed a local subsidiary—Petitioner Balkan Ghana—on July 16, 2007. *Id.* ¶ 18. Balkan Ghana is a wholly-owned subsidiary of Petitioner Balkan UK, a company formed and registered in the United Kingdom and Wales. *Id.* ¶ 15. Balkan UK, in turn, is a wholly-owned subsidiary of Balkan Energy LLC. *Id.* Eleven days after its formation, Petitioner Balkan Ghana and Respondent Republic of Ghana entered into a Power Purchase Agreement ("PPA") memorializing the parties' agreement. *Id.* ¶ 18; Pet., Ex. C, ECF No. 1-4 [hereinafter PPA]. As laid out in the PPA, Balkan Ghana was to refurbish, equip, commission, test, and operate the barge. Pet. ¶ 18 (citing PPA, arts. 2.1–2.4). In turn, Ghana was to provide electricity onsite; connect the site to the national electrical grid; facilitate the importation of equipment and acquisition of permits, approvals, and visas; construct and install the transmission line required for connection to the national grid; and pay for all electricity generated by the barge during the contract term. *Id.* (citing PPA, arts. 2.5–2.10). Under the PPA, the parties agreed to submit any disputes to arbitration before the Permanent Court of Arbitration in The Hague, Netherlands. *See* PPA, art. 22.2. The parties also agreed that the PPA "shall be governed by and construed in accordance with the laws of the Republic of Ghana." PPA, art. 23.

Article 181(5) of the 1992 Constitution of Ghana requires parliamentary approval for any "international business or economic transaction to which the Government is a party." In light of this requirement, Article 7.2 of the PPA conditioned the effectiveness of the PPA on the requirement that Ghana provide assurances regarding its authority to enter into the agreement with Balkan Ghana without parliamentary approval, in the form of "a letter from the Government of Ghana that all the required approvals from the relevant authorities in Ghana have been obtained,"

as well as a "legal opinion of the Attorney General of the Republic of Ghana as to the validity, enforceability[,] and binding effect of [the PPA]." PPA, art. 7.2. Accordingly, on October 26, 2007, Ghana's Attorney General and Minister for Justice provided Balkan Ghana with two legal opinions. *See* Pet., Ex. D, ECF No. 1-5 [hereinafter 1st AG Opinion]; Pet., Ex. E, ECF No. 1-6 [hereinafter 2d AG Opinion]. The first opinion explained that because Balkan Ghana was a locally incorporated company, the project "involve[d] a local company in a local transaction with the Government," and thus the "PPA does not come under the ambit of article 181(5) of the 1992 Constitution" and "[p]arliamentary approval would not be required for the effectiveness of the [PPA]." 1st AG Opinion at 1. In the second opinion, the Attorney General assured Balkan Ghana that "[Ghana] has the power to enter into the [PPA] and to exercise its rights and perform its obligations thereunder, and execution of the [PPA] on behalf of [Ghana] by the person(s) who executed the [PPA] was duly authori[z]ed." 2d AG Opinion at 1.

After some time, a dispute arose between the parties. Balkan Ghana accused Ghana of failing to fulfill its obligations under the PPA—specifically, the requirements that Ghana provide adequate site electricity and connect the Barge to the electrical grid. Pet. ¶¶ 25–26; Pet., Ex. A, ECF No. 1-2 [hereinafter Award on the Merits], ¶¶ 279–81, 285–87. For its part, Ghana denied that it had breached the PPA. Ghana's Attorney General sent a Notice of Breach to Balkan Ghana in September 2009, asserting that the "dispute between the parties . . . cannot be settled through direct discussions by the Parties." Pet., Ex. F, ECF No. 1-7, at 1–2. The Attorney General "invoke[d] clause 22.2 of the PPA" and "recommended that the [dispute] be referred to the Permanent Court of Arbitration for resolution." *Id.* The Attorney General never filed a notice of arbitration, but Balkan Ghana did so on December 23, 2009, pursuant to Article 22.2 of the PPA.

An arbitral tribunal was constituted on April 1, 2010. Pet., Ex. B, ECF No. 1-3 [hereinafter Interim Award], ¶ 7.

On June 25, 2010, the Attorney General of Ghana obtained an ex parte injunction from the Ghana High Court restraining Balkan Ghana from proceeding with arbitration pending the court's determination of whether the PPA and its arbitration clause required parliamentary approval under Article 181(5) of the Ghana Constitution. Interim Award ¶ 45. The arbitral tribunal nonetheless issued an Interim Award addressing its jurisdiction to hear the dispute in December 2010. *See generally* Interim Award. The tribunal concluded that the arbitration agreement in the PPA was severable from the larger contract, *id.* ¶¶ 99, 106–08, and that while the PPA as a whole was governed by Ghanaian law, the arbitration agreement was governed by the law of the Netherlands, as the designated seat of arbitration, *id.* ¶¶ 151–52. Applying Dutch law, the tribunal explained that "the validity of the arbitration agreement is not affected by Article 181(5) of the [Ghana] Constitution," *id.* ¶ 159, and that it "d[id] not have any doubts as to its jurisdiction under the arbitration agreement . . . irrespective of the decision that may be reached in the Ghanaian courts regarding the validity or enforceability of the PPA," *id.* ¶ 187.

Meanwhile, the Supreme Court of Ghana decided to "refer to itself" the central constitutional question presented to the Ghana High Court (Commercial Division) concerning the PPA. Pet., Ex. G, ECF No. 1-8 [hereinafter Ghana Sup. Ct. Decision], at 2. In a decision captioned *The Attorney General v. Balkan Energy Ghana Ltd., et al.*, and issued on May 16, 2012, the court stated that it had two issues to resolve: (1) "whether or not the [PPA] . . . constitutes an international business transaction within the meaning of Article 181(5) of the Constitution"; and (2) "whether or not the arbitration provisions contained in clause 22.2 of the [PPA] . . . constitutes an international business transaction within the meaning of Article 181(5) of the Constitution."

Ghana Sup. Ct. Decision at 2–3. The Supreme Court of Ghana concluded that the PPA itself was indeed an "international business transaction" that should have been approved by Ghana's Parliament. *Id.* at 40–41. But it also held that, "[o]n the other hand," the "arbitration provisions contained in clause 22.2 of the [PPA] . . . [do] not constitute an international business transaction within the meaning of Article 181(5)." *Id.* at 41. As to the latter holding, the court tersely explained that "it is clear that the international arbitration provision cannot, in and of itself, constitute an international business or economic transaction." *Id.* In so concluding, the Supreme Court of Ghana also observed the following:

> An international commercial arbitration is not by itself an autonomous transaction commercial in nature which pertains to or impacts . . . the wealth and resources of the country. An international commercial arbitration draws its life from the transaction whose dispute-resolution it deals with. We therefore have difficulty in conceiving of it as a transaction separate and independent from the transaction that has generated the dispute it is required to resolve.

*Id.* The Supreme Court then returned the matter to the High Court to apply the Supreme Court's interpretation of Article 181(5). *Id.*

The arbitral tribunal pressed on after the Supreme Court of Ghana rendered its decision. After considering extensive briefing by the parties and holding a week-long hearing in the matter, Pet. ¶ 36, the tribunal issued its final Award on the Merits ("Award") on April 1, 2014, in favor of Balkan Ghana. The tribunal found that: (1) Balkan Ghana had a reasonable expectation that Ghana had accepted the validity of the PPA, and was therefore entitled to rely on the PPA and expect that Ghana would fulfill its obligations thereunder, Award on the Merits ¶ 397; and (2) Ghana failed to comply with its obligations under the PPA, *id.* ¶ 437–42, 448–52. The tribunal ordered Ghana to pay Balkan Ghana a total of $11.75 million plus interest and costs. Pet. ¶¶ 41–42; *see* Award on the Merits ¶ 642. The tribunal also ordered that the PPA be terminated as of the date of the

Award. Award on the Merits ¶ 642. Petitioners assert that, as of the date of the filing of the Petition, the amount owing from Ghana is approximately $13,348,720. Pet. ¶ 45; Pet., Ex. J, ECF No. 1-11.

On August 22, 2016, Balkan Ghana and Balkan UK agreed to a deed of assignment wherein Balkan Ghana assigned all of its rights and interests in the Award to Balkan UK.[1] *See* Pet., Ex. I, ECF No. 1-10 [hereinafter Deed of Assignment].

### B. Procedural Background

On March 31, 2017, Balkan UK and Balkan Ghana filed the instant Petition to confirm the Award. *See generally* Pet. Ghana moved to dismiss the Petition on August 24, 2017. Resp't's Mot. to Dismiss, ECF No. 17 [hereinafter Resp't's Mot.]. In its motion, Ghana "reserv[ed] its rights to answer the petition, conduct necessary discovery, and proceed onto the merits" at a later point. *Id.* at 13. Petitioners opposed the motion. Pet'rs' Mem. of Law in Opp'n to Mot. to Dismiss and Reply in Supp. of Pet., ECF No. 19 [hereinafter Pet'rs' Opp'n]. Ghana replied to the opposition, Resp't's Reply, ECF No. 22, and then proceeded to submit to the court a number of additional filings, including a "*preliminary* response" to the petition, in which it raised for the first time: (1) defenses under Article V of the New York Convention, *see* Resp't's Prelim. Resp., ECF No. 23; and (2) a declaration of a Ghanaian attorney, opining on Ghanaian law, Decl. of Anthony Akoto Ampaw, ECF No. 24 [hereinafter Ampaw Decl.]. Respondent also filed a notice concerning two foreign judgments entered against Balkan Ghana in the High Court of Ghana. Resp't's Notice of Foreign Garnishment Order & Foreign J., ECF No. 32. Petitioners responded to only two of these filings and did not respond to the defenses raised by Respondent under the New York

---

[1] Prior to this assignment, on January 1, 2010, Balkan Ghana and Balkan UK agreed to an interest in claim assignment by which Balkan UK acquired the right to 95% of any recovery from the arbitration in return for an agreement to pay the costs and expenses of arbitration. *See* Pet., Ex. H, ECF No. 1-9.

Convention.  *See* Pet'rs' Resp. to Notice of Suppl. Auth., ECF No. 28; Pet'rs' Resp. to Ghana's Notice of Foreign Garnishment & J., ECF No. 34.

The dubiousness of Ghana's procedural maneuvering aside,[2] the court at oral argument presented Petitioners with the option to submit additional briefing before the court ruled on the arguments raised in Ghana's additional filings.  Hr'g Tr., ECF No. 35, at 3–6.  Counsel for Petitioners declined, citing Petitioners' desire for a summary resolution of the Petition as contemplated by the Federal Arbitration Act.  *Id.* at 5.

The issues raised in the Petition, the Motion to Dismiss, and the Preliminary Response to the Petition are therefore ripe for consideration.

## III.    LEGAL STANDARD

The New York Convention, which is incorporated in the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. §§ 201–208, "is a multilateral treaty that, with exceptions, obligates participating countries to honor international commercial arbitration agreements and to recognize and enforce arbitral awards rendered pursuant to such agreements."  *Enron Nigeria Power Holding Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 283 (D.C. Cir. 2016).

As the D.C. Circuit has recognized, "[c]onsistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court[,] . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  Courts "may refuse to enforce the

---

[2] "[M]otions to enforce arbitral awards should proceed under motions practice."  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007); *see* 9 U.S.C. § 6 (providing that an application to confirm an arbitral award "shall be made and heard in the manner provided by law for the making and hearing of motions").  Accordingly, in this court's view, Ghana should have included all arguments and supporting affidavits for denial of the Petition in its response to the Petition, rather than submitting them in piecemeal fashion.

award [under the New York Convention] only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)); *see* 9 U.S.C. § 207 (providing that the reviewing court "*shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention" (emphasis added)). Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).

## IV.    DISCUSSION

Ghana advances four arguments in support of dismissing and/or denying the Petition. First, it asserts that this court lacks subject-matter jurisdiction because Ghana is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). Second, Ghana contends that, even if this court has jurisdiction over this action, dismissal is appropriate under the doctrine of *forum non conveniens* because Ghana is the better forum in which to resolve the dispute. Third, Ghana maintains that neither Petitioner has standing to bring the Petition because the assignment of the Award from Balkan Ghana to Balkan UK was invalid. And finally, Ghana asserts that confirmation of the petition should be denied because various defenses under the New York Convention apply. The court addresses each argument in turn.

### A.    Subject Matter Jurisdiction under the Foreign Sovereign Immunities Act

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of the [United States]." *Belize Soc. Dev. Ltd. v. Gov't of Belize* ("*Belize Soc. Dev. II*"), 794 F.3d 99, 101 (D.C. Cir. 2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428,

443 (1989)). Pursuant to the FSIA, "a foreign state is presumptively immune from the jurisdiction of the United States courts[,] unless a specified exception applies." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity" laid out in the FSIA, as a "threshold" matter in every action against a foreign state, a district court "must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983); *see* 28 U.S.C. § 1605(a). Under the FSIA, "the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

As relevant here, under what is commonly known as the "arbitration exception," the FSIA provides an exception to foreign sovereign immunity in suits:

> in which the action is brought[ ] either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship . . . or to confirm an award made pursuant to such an agreement to arbitrate, if . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).[3] This arbitration exception "by its terms" applies to actions to confirm arbitration awards under the New York Convention. *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999). In this case, because the Award was made in The Hague, Netherlands, and enforcement is sought in the United States—both signatories to the New York Convention—the Award on the Merits is governed by the Convention. *See Chevron Corp. v. Republic of Ecuador ("Chevron Corp. I")*, 949 F. Supp. 2d 57, 62 (D.D.C. 2013) ("Because the

---

[3] Petitioners also assert that the FSIA's waiver exception, 28 U.S.C. § 1605(a)(1), confers subject-matter jurisdiction over this matter, but the court need not reach that question in light of its decision that the arbitration exception applies.

arbitration in this matter was conducted at The Hague and the Netherlands is a party to the New York Convention, the Final Award here is governed by the Convention."), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015). The court thus finds that the FSIA's arbitration exception applies in this case.

Each of Ghana's arguments against exercising subject-matter jurisdiction under Section 1605(a)(6) is unavailing. Ghana asserts that the FSIA's arbitration exception cannot apply for two primary reasons: (1) the arbitration agreement is itself invalid under Ghanaian law, and (2) a threshold question to award confirmation is determining the validity of the assignment of the Award to Balkan UK, but the arbitration exception does not confer subject-matter jurisdiction to make that predicate assessment. The court addresses those assertions in turn.

### 1.     *Validity of the Arbitration Clause*

Relying on Ghanaian law, Ghana argues that Section 1605(a)(6) does not apply here because the arbitration agreement is itself invalid. In Ghana's view, the arbitration clause is not severable from the PPA, and because the PPA was never approved by the Ghanaian Parliament, the government official who entered into the PPA—and the arbitration agreement contained therein—lacked the authority to do so. According to Ghana, the arbitration clause therefore was not "made by the foreign state" for purposes of the arbitration exception. Resp't's Reply at 4; Ampaw Decl. ¶ 2.

Ghana's position, however, is squarely foreclosed by authority from this Circuit. In *Belize Social Development II*, the D.C. Circuit faced a similar argument concerning the purported invalidity of an arbitration clause as a threshold subject-matter jurisdiction issue. *See* 794 F.3d 99, 102 (D.C. Cir. 2015). There, the Government of Belize argued that its former Prime Minister lacked actual authority to enter into the agreement that contained the arbitration clause and, as a result, "the agreement, including the arbitration provision, [wa]s void." *Id.* The D.C. Circuit

rejected that argument based on a plain reading of the FSIA itself: "The language of the FSIA arbitration exception makes clear that the agreement to arbitrate is severable from the underlying contract." *Id.*; *see also id.* at 103 ("More briefly put, this case turns on the proposition that Belize entered two agreements: the Accommodation Agreement and the Agreement to Submit to Arbitration, albeit the two were entered simultaneously."). Thus, to avoid jurisdiction under the arbitration exception, the court observed, Belize could not prevail by showing that the *underlying agreement* was invalid. Rather, it would have to establish that the Prime Minister lacked the authority to enter into the *arbitration agreement* itself. *Id.* at 102–03.

As did the Government of Belize, Ghana seeks to avoid subject-matter jurisdiction under the arbitration exception solely by attacking the validity of the PPA. This it cannot do. Under *Belize Social Development II*, the critical question is not whether the underlying agreement is valid, but whether the arbitration agreement *itself* is invalid. Thus, Ghana's contention that the government official who signed the PPA lacked contracting authority because he did not first secure parliamentary authorization does not allow it to evade jurisdiction under the arbitration exception of the FSIA.

Ghana asserts that *Belize Social Development II* is distinguishable because, unlike the Government of Belize, Ghana has provided an expert opinion establishing that the arbitration clause *itself* is invalid under Ghanaian law. But, upon closer inspection, the expert opinion— which relies chiefly on the Ghana Supreme Court's decision in *The Attorney General v. Balkan Energy Ghana Ltd.*—solely challenges the validity of the PPA, and not the agreement to arbitrate. According to Ghana's expert, "an arbitration clause found in an international agreement governed by Article 181 is not severable from the international agreement and is invalid if the international agreement was not approved by Parliament." Ampaw Decl. ¶ 8. In his view, because the Ghana

Supreme Court held that the PPA was an "international business or economic transaction" that required parliamentary approval, and because the arbitration clause is not severable from the PPA, the clause is therefore invalid. Stated differently, Ghana's expert challenges the validity of the arbitration clause solely by reference to the invalidity of the PPA. *See generally* Ampaw Decl. Such "invalid agreement *ergo* invalid arbitration clause" logic has already been rejected by the D.C. Circuit. *Belize Soc. Dev. II*, 794 F.3d at 102–03. The court cannot depart from that precedent.

The court could stop its analysis here, but in the interest of completeness addresses the argument that Ghana does not expressly make—that the agreement to arbitrate is itself invalid.[4] "[I]f a contract contains a general choice of law clause and provides in the arbitral clause that arbitration is to be held in a country with a different law, the latter indication must be deemed to prevail over the former." Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 293 (1981). In this case, because the parties designated in the arbitral clause that The Hague, Netherlands was to serve as the seat of arbitration, Dutch law supplied the law applicable to the arbitration agreement. *See* Jay E. Genig, *International Commercial Arbitration* § 7.2 (January 2018 update) ("In the absence of any express choice [regarding the law applicable to the arbitration agreement], the applicable law is generally the law of the seat of arbitration."); *cf. Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 291 (5th Cir. 2004) ("Under the New York Convention, an agreement specifying the place of the arbitration creates a presumption that the procedural law of that place applies to the arbitration."). That is precisely what the arbitral tribunal held. *See* Interim Award ¶¶ 152, 154. Ghana offers no argument as to why the arbitration agreement is invalid under

---

[4] The court addresses this issue because portions of Ghana's pleadings, liberally construed, could be understood to make the argument that the arbitration agreement is invalid, irrespective of the validity of the PPA.

Dutch law. Its failure to address the law that governs the arbitration agreement therefore defeats any assertion that the agreement is invalid. *See Belize Soc. Dev. II*, 794 F.3d at 102–03.

Ghana's challenge to the arbitration agreement proceeds from the assumption that, because the parties chose Ghanaian law to govern the PPA, Ghanaian law also governs the arbitration clause. As already discussed, that view of the law is wrong. But even if the court were to consider Ghanaian law in assessing the validity of the arbitration clause, Respondent's arguments would still fail because they are based on a misreading of the Supreme Court of Ghana's decision in *The Attorney General v. Balkan Energy Ghana Ltd.* Contrary to Respondent's reading, the Supreme Court of Ghana held that the arbitration provision was *not* an "international business or economic transaction" that required Parliament's approval under Article 181(5) of the Constitution. Ghana Sup. Ct. Decision at 40–41. Notwithstanding the significance of this legal holding, Ghana's expert makes much of the language following it—wherein the court noted its "difficulty in conceiving of [the arbitration clause] as a transaction separate and independent from the transaction that has generated the dispute it is required to resolve." *Id.* at 41. Based on that passage, Ghana's expert concludes that the arbitration clause is not severable from the PPA, and therefore, invalid because the PPA was not approved by the Parliament.

This court is unpersuaded by Ampaw's skewed reading of the Ghanaian Supreme Court's decision.[5] In interpreting the decision, Ampaw conveniently excludes from his block quotation of the Supreme Court's opinion the very first line of the paragraph announcing the pertinent holding:

---

[5] Pursuant to Federal Rule of Civil Procedure 44.1, when determining the law of a foreign jurisdiction, this court may "consider any relevant material or source." Fed. R. Civ. P. 44.1. "Most often, foreign law is established through written or oral expert testimony accompanied by extracts from foreign legal material." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 228 (D.D.C. 2011). Though such expert testimony aids the court in determining the content of the law, the court "need not uncritically accept such expert testimony and may 'engage in its own research or reexamine and amplify material that has been presented by counsel in partisan fashion.'" *Id.* (quoting Fed. R. Civ. P. 44.1 advisory committee's note). Consistent with this authority, the court conducts its own review of the Ghanaian Supreme Court decision.

"On the other hand, the answer to the second issue referred is that the arbitration provisions contained in clause 22.2 of the [PPA] . . . [do] not constitute an international business transaction within the meaning of Article 181(5) of the Constitution." *Compare* Ampaw Decl. ¶ 4, *with* Ghana Sup. Ct. Decision at 41. The Supreme Court's reference to the "second issue referred" is to the question: "Whether or not the arbitration provisions contained in clause 22.2 of the [PPA] . . . constitutes an international business transaction within the meaning of Article 181(5) of the Constitution." Ghana Sup. Ct. Decision at 2–3. And, the court's use of the phrase "on the other hand" signals a clear pivot from its earlier holding that the PPA itself was subject to Article 181(5) approval. Thus, read in context, the Supreme Court of Ghana reached the unmistakable conclusion that, under Ghanaian law, the arbitration agreement did not require parliamentary approval and thus was valid.[6]

In sum, Ghana has not offered any evidence that the arbitration agreement itself is invalid under the law of the Netherlands, or even under the law of Ghana. Its effort to avoid subject-matter jurisdiction based on the invalidity of the arbitration agreement therefore fails.

### 2. *Effect of the Assignment on Subject-Matter Jurisdiction*

Ghana's next argument hinges on the assignment of the Award by Balkan Ghana to Balkan UK. Ghana's argument is specific as to each Petitioner. As to Balkan Ghana, Respondent insists that the Ghanaian company cannot invoke the FSIA's arbitration exception because, by virtue of the assignment and its filings in this court, it has "judicially admitted" that it has no rights in the

---

[6] The court also rejects Ampaw's reading for other reasons. For one, the Supreme Court of Ghana was not engaging in a contractual legal analysis of the severability of the arbitration clause from the PPA that contained it. Rather, the court was elaborating on the legal conclusion it did reach—that the arbitration clause did not need parliamentary approval—by explaining that such a clause cannot be "by itself an autonomous transaction commercial in nature which pertains to or impacts on the wealth and resources of the country." *Id.* at 41. The court's reading of the decision is further bolstered by the fact that the 2010 Alternative Dispute Resolution Act of Ghana considers arbitration agreements to be severable from the agreements that contain them. *See* Pet'rs' Notice of Foreign Law Auth., ECF No. 29, Ex. B, § 3(1). It is doubtful that the Supreme Court of Ghana purported to reach the conclusion advanced by Respondent without addressing this statutory authority or even mentioning it.

Award. As to Balkan UK, Respondent asserts that its capacity to enforce the Award is dependent on the predicate question of the assignment's validity and, as to that threshold question, the FSIA's arbitration exception does not confer subject-matter jurisdiction. Resp't's Mem. at 4–7, 8–10. The court does not address Respondent's argument as to Balkan Ghana, because it concludes that Balkan UK's claim to enforce the Award is sufficient to secure jurisdiction under the arbitration exception.

Nothing in Section 1605(a)(6) requires a court to resolve whether an arbitration award was validly assigned as a necessary precondition to recognizing subject-matter jurisdiction under the arbitration exception. The Government of Belize made the same argument that Ghana does now to the district court in *Belize Social Development*, and the district court rejected it. *Belize Soc. Dev. Ltd. v. Gov't of Belize* ("*Belize Soc. Dev. I*"), 5 F. Supp. 3d 25, 34 n.8 (D.D.C. 2013), *aff'd*, *Belize Soc. Dev. II*, 749 F.3d 99 (D.C. Cir. 2015). As was true there, Respondent in this case "cites no case . . . in which a foreign state's amenability to suit under the FSIA turns on the validity of an assignment to the plaintiff." *Id.*; *see Blue Ridge Invs., LLC v. Republic of Argentina*, 902 F. Supp. 2d 367, 375 n.7 (S.D.N.Y. 2012) ("Nothing in the plain language of [Section 1605(a)(6)] suggests that an action 'to confirm an award made pursuant to . . . an agreement to arbitrate' must be brought by the party that entered into the arbitration agreement with the foreign state." (quoting 28 U.S.C. § 1605(a)(6)), *aff'd*, 735 F.3d 72 (2d Cir. 2013). Thus, the question of the assignment's validity presents no jurisdictional impediment.

Accordingly, the court is satisfied that the FSIA's arbitration exception applies in this case; Ghana therefore does not enjoy sovereign immunity from this enforcement action.

**B.      *Forum Non Conveniens***

Ghana next argues that the Petition should be dismissed on *forum non conveniens* grounds, because "Ghana is an adequate alternative forum and the private and public factors favor the Ghanaian judicial forum."  Resp't's Mot., Mem. in Support of Mot. to Dismiss, ECF No. 17-1 [hereinafter Resp't's Mem.], at 2.  Under the doctrine of *forum non conveniens*, "a court must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal."  *Agudas Chaisdei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008) (citing *Paper Aircraft Co. v. Reyno*, 4534 U.S. 235, 255 n.22 (1981)).  The court need not apply this test, however, because Ghana's argument is squarely foreclosed by *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 293, 303 (D.C. Cir. 2005).

In *TMR*, the D.C. Circuit held that "the doctrine of *forum non conveniens* does not apply to actions in the United States to enforce arbitral awards against foreign nations."  *BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) (citing *TMR*, 411 F.3d at 303–04).  This is because "only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States," rendering alternative forums inadequate.  *TMR*, 411 F.3d at 303.  Notwithstanding this authority, Ghana invites this court to depart from binding precedent because it interprets the Supreme Court's decision in *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007), to overrule *TMR*.  The court declines the invitation.  Counsel for Ghana have pressed this exact argument to the D.C. Circuit on other occasions, *e.g.*, Pet'rs' Opp'n at 13–14 (citing counsel's briefing in other cases before the D.C. Circuit urging departure from *TMR* in light of *Sinochem*), but to no avail.  The D.C. Circuit continues to apply *TMR*, and so too must this court.  *See Belize Soc. Dev. II*, 794 F.3d at 105

(rejecting respondent's request to revisit the *forum non conveniens* issue, where the "argument[ ] w[as] adequately discussed and rejected by the district court, and [did not] warrant further exposition by this Court"); *BCB Holdings*, 650 F. App'x at 19 (holding that Belize's argument that the action should have been dismissed on *forum non conveniens* grounds "is squarely foreclosed by our precedent" (citing *TMR Energy*, 411 F.3d at 296)); *see also BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 45 (D.D.C. 2017) (holding that *TMR* and *Sinochem* are "not in conflict"). The court therefore rejects Ghana's *forum non conveniens* argument.

## C. Standing

Ghana takes the puzzling position that neither Petitioner has standing to enforce the Award. According to Ghana, Balkan UK lacks standing to enforce the Award because the assignment agreement is invalid. Ghana challenges the assignment both under Ghanaian law and under the terms of the PPA. Moreover, Ghana maintains that Balkan Ghana also lacks standing because, by assigning its rights to Balkan UK, Balkan Ghana "relinquished any rights to confirm the award." Resp't's Mem. at 10. The court is unpersuaded by these arguments and concludes that Balkan UK has standing to seek confirmation and enforcement of the Award.

To begin with, the assignment agreement between Balkan UK and Balkan Ghana contains a clear choice-of-law clause, providing that "[t]his Deed [of Assignment] and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales." Deed of Assignment ¶ 6. Ghana offers little to sway the court from honoring the parties' choice of law, beyond assertions of its Ghanaian legal expert that because the PPA is governed by Ghanaian law and because the Award "affects the contractual obligations of the Republic of Ghana under the PPA, any assignment would be governed by Ghanaian law." Ampaw Decl. ¶¶ 17–18.

Ghana's expert, however, offers no explanation for how Ghanaian law could possibly operate to overcome the chosen law of the parties to a separate assignment agreement. The expert's conclusory assertion does not warrant deviation from the general principle that courts "favor[] application of the law that the parties to a contract agreed would apply." *Belize Soc. Dev. I*, 5 F. Supp. 3d at 36 n.4 (reviewing cases and applying English law to determine the validity of an assignment that "[b]y its own terms" was to be governed by English law). The court therefore applies English law to assess the validity of the assignment.[7]

To that end, Petitioners provide the expert legal opinion of an English solicitor, James Samuel George Hargrove. *See* Pet'rs' Opp'n, Decl. of James Samuel George Hargrove, ECF No. 19-1 [hereinafter Hargrove Decl.]. Hargrove explains that, under English law, "[t]he Deed of Assignment satisfies the requirements for a legal/statutory assignment" and that, accordingly, "Balkan [Energy] acquired the legal right to [the Award] with a legal remedy for its recovery and the power to give a good discharge," meaning that "Balkan [Energy] is entitled to bring proceedings in its own name." Hargrove Decl., Legal Op., ECF No. 19-2 [hereinafter Hargrove Legal Op.], at 3–4. Petitioners' expert legal opinion is effectively uncontested by Ghana, as Ghana has not provided an expert opinion assessing the assignment under English law. The court therefore finds that the assignment is valid under English law.

Ghana's argument that the terms of the PPA bars the assignment is equally unconvincing. The PPA provides that "[n]either Party may assign nor transfer all or any part of its rights, benefits, or obligations hereunder without the written consent of the other Party." PPA art. 19. Based on

---

[7] The court is likewise unpersuaded by Ghana's suggestion that "English law is irrelevant, because there was no legal nexus between English law and the arbitration." Resp't's Resp. at 13. Contrary to Respondent's reading of *Belize Social Development I*, the district court did not apply English law to determine the validity of the assignment "because the arbitral seat was . . . in London." *Id.* Instead, as the court clearly explained, it honored the parties' choice-of-law clause contained *in the assignment agreement*. 5 F. Supp. 3d at 36. The court therefore rejects Respondent's unsupported contention that such a "nexus" is required before applying the law chosen by the parties to govern an assignment.

that provision, Ghana maintains that the assignment was invalid because Ghana did not consent to it. That contention fails for two reasons. First, the arbitral tribunal terminated the PPA when it rendered its Award on the Merits in April 2014, *before* Balkan Ghana assigned its rights in the Award to Balkan UK in August 2016. *See* Award on the Merits ¶ 642; Deed of Assignment. Thus, because the PPA was void on the date of the assignment, there was no right of refusal for Ghana to exercise under the PPA. Second, the court accepts the uncontested legal opinion of Hargrove, who concludes that, under English law, "the Award[] created new rights, superseding the causes of action arising out [of] the breach of the PPA." Hargrove Legal Op. at 4–5. Thus, under the law applicable to the assignment, Balkan Ghana need not have obtained Ghana's written consent before assigning its rights to the Award.

Finally, in its Preliminary Response to the Petition, Ghana requests "leave to conduct limited discovery to obtain documents from and take depositions of both Petitioners on the issue of the validity and effect of the assignment." Resp't's Prelim. Resp. at 14–15. In the interest of ensuring that this enforcement proceeding remain "summary" in nature, *TermoRio S.A.*, 487 F.3d at 940, the court declines Ghana's demand for discovery.

In sum, the court concludes that Balkan Ghana legally assigned its rights in the Award to Balkan UK and therefore Balkan UK has standing to bring this enforcement action under the New York Convention.

### D.    Ghana's Defenses Under the New York Convention

The court turns next to the grounds raised by Ghana under Article V of the New York Convention, which sets forth the only grounds available for setting aside an arbitral award. *See TermoRio*, 487 F.3d at 933. "[T]he burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation . . . and '[t]he showing

required to avoid summary confirmation is high.'" *Int'l Trading & Indus. Inv. Co.*, 763 F. Supp. 2d at 20 (quoting *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987)).

Here, Ghana contends that the Award should be set aside for three reasons: (1) the arbitration agreement is invalid under Ghanaian law; (2) the parties did not agree to submit the question of the validity of the arbitration clause to the arbitral tribunal; and (3) recognition of the Award would be contrary to the public policy of the United States. None of these arguments supplies a defense to confirmation of the Award.

### 1. Article V(1)(a): Invalidity of Arbitration Agreement

Article V(1)(a) of the Convention allows a court to refuse recognition and enforcement if the arbitration "agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made." New York Convention, art. V(1)(a). Ghana's primary objection to confirmation of the Award under Article V(1)(a) is that, under the laws of Ghana, the arbitration agreement is invalid because it is not severable from the PPA and therefore must have been approved by the Ghanaian Parliament in accordance with the 1992 Ghana Constitution to be effective. That is the same argument Ghana advanced, and the court rejected, when arguing that the FSIA's arbitration exception does not apply in this case. Therefore, for the reasons discussed in Part IV(A), Article V(1)(a) does not provide a ground to deny the Petition.

### 2. Article V(1)(c): Arbitrability

Ghana next asserts that confirmation may be denied under Article V(1)(c) of the New York Convention because "[t]here is no evidence that the parties 'clearly and unmistakably' agreed to submit the question of the validity of the arbitration clause to the arbitral tribunal." Resp't's Prelim. Resp. at 7 (quoting *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244

F. Supp. 3d 100, 111–12 (D.D.C. 2017)).  According to Ghana, determining the validity of the arbitration clause lies within the exclusive jurisdiction of the Supreme Court of Ghana, not the arbitral tribunal.  Ghana therefore asserts that confirmation of the Award should be denied because "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration."  New York Convention, art. V(1)(c).

But Ghana's reliance on Article V(1)(c) fails because Ghana overlooks the express terms of its agreement to arbitrate in the PPA.  Article 22.2 of the PPA clearly provides that "Arbitration shall be governed by and conducted in accordance with UNCITRAL [United National Commission on International Trade Law] rules."  Pursuant to UNCITRAL rules, "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause," and "shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part."  *Chevron Corp. II*, 795 F.3d at 207–08 (quoting UNCITRAL Arbitration Rules, G.A. Res. 31/91 art. 21 (Dec. 15, 1976)).  In this Circuit, "incorporation of the UNCITRAL Rules provides clear and unmistakable evidence that the parties intended for the arbitrator to decide questions of arbitrability."  *Chevron Corp. I*, 949 F. Supp. 2d at 67 (alterations omitted) (quoting *Republic of Argentina v. BG Group PLC*, 665 F.3d 1363, 1371 (D.C. Cir. 2012)).  Ghana "therefore consented to allow the arbitral tribunal to decide issues of arbitrability."  *Chevron Corp. II*, 795 F.3d at 207–08.  Accordingly, the court rejects Ghana's challenge under Article V(1)(c).

### 3.  Article V(2)(b): Public Policy

Finally, Ghana urges the court to deny the Petition because "recognition or enforcement of the award would be contrary to the public policy" of the United States.  *See* New York Convention

art. V(2)(b).  According to Ghana, enforcing an arbitration award predicated on the PPA's arbitration clause—which, as established above, Respondent believes its Supreme Court held to be violative of the Ghanaian Constitution—violates U.S. policy to afford international comity to decisions of foreign courts.  Resp't's Prelim. Resp. at 8–9.

"The public policy defense under Article V(2)(b) of the New York Convention is to be construed narrowly and is available only where an arbitration award 'tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property.'"  *Enron Nigeria Power Holding, Ltd.*, 844 F.3d at 289 (quoting *TermoRio S.A.*, 487 F.3d at 938).  "Although this defense is frequently raised, it has rarely been successful."  *BCB Holdings Ltd.*, 110 F. Supp. 3d at 249 (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Systems, Inc.*, 665 F.3d 1091, 1097 (9th Cir. 2011)).

As discussed, the court disagrees with Respondent's reading of the Supreme Court of Ghana's opinion, and Respondent offers little more than its expert's unpersuasive gloss on that holding.  Moreover, Ghana cites no authority for the proposition that not affording deference to the Ghanaian Supreme Court would "violate the [United States'] most basic notions of morality and justice," as required to establish a public policy defense.  *TermoRio S.A.*, 487 F.3d at 938 (citation omitted).  Indeed, in light of the court's holdings, enforcement in this case would not "violate any 'basic notion of morality and justice' rooted in" the public policy of international

comity.  *BCB Holdings Ltd.*, 650 F. App'x at 19.  Accordingly, the court rejects Ghana's public policy defense.

### E.      Garnishment Order and Judgment

One final issue merits discussion.  In the last of its filings with the court, Ghana requests that this court take notice of: (1) a garnishment order entered by the High Court of Ghana on October 13, 2017, ordering the Republic of Ghana to pay Zenith Bank Ghana Ltd. up to $44.15 million in funds otherwise owed to Balkan Ghana, and (2) a €75 million judgment entered by the High Court of Ghana in favor of Ghana against Balkan Ghana on November 23, 2017.  *See* Resp't's Notice of Foreign Garnishment Order & Foreign J., ECF No. 32.  According to Ghana, the garnishment order compels Ghana to pay any amounts owing under the arbitration award to Balkan Ghana's creditor, Zenith Bank Ghana.  *Id.* at 2.  Ghana asserts that when the garnishment order issued, Balkan Ghana "ceased to have title or right to payment pursuant to the arbitration award at issue in this litigation" because its creditor was awarded, through garnishment, the funds Balkan Ghana is entitled receive to under the Award.  *Id.*  Ghana also asserts that the €75 million judgment against Balkan Ghana "for the recovery of damages caused to a barge by Balkan [Ghana]" "more than offsets the arbitration award at issue in this litigation."  *Id.*  Finally, Respondent offers the declaration of a Principal State Attorney of Ghana, authenticating the garnishment order and judgment.  *See* Decl. of Grace Mbrokoh-Ewoal, ECF No. 34.

The court has considered Ghana's request and declines to take notice of the order and judgment because doing so will have no effect on the court's confirmation of the Award.  A court "may refuse to enforce the award *only* on the grounds explicitly set forth in Article V of the Convention."  *TermoRio S.A.*, 487 F.3d at 933 (emphasis added); *see also* 9 U.S.C. § 207.  The only defense that the Ghanaian court judgments could conceivably support arises under Article

V(1)(e) of the Convention. But that clause does not apply on its face because the Award "has [not] been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made,"—here, the Netherlands. New York Convention, art. V(1)(e). Moreover, Ghana fails to explain how the October 2017 garnishment order and the November 2017 judgment have any retroactive effect on the 2016 assignment of the Award to Balkan UK, which is nowhere referenced in the order and judgment. Thus, the court concludes that these foreign proceedings provide no reason to deny confirmation of the Award in favor of Balkan UK.

## V.    AWARD AND ORDER

Consistent with the practice of other courts in similar confirmation proceedings, to the extent prejudgment interest is not already reflected in Petitioners' claim calculation, *see* Pet., Ex. J, ECF No. 1-11, the Award shall include such interest from July 1, 2009, until the date of payment. *See Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 40 (D.D.C. 2016). Petitioners shall submit to the court a proposed judgment amount with all interest calculations performed no later than April 6, 2018, as well as a draft order of final judgment.

## VI.    CONCLUSION

For the foregoing reasons, the court grants the Petition to Confirm Arbitral Award against Respondent Republic of Ghana in favor of Balkan UK and denies the Republic of Ghana's Motion to Dismiss Petition.


Dated:  March 22, 2018                                  Amit P. Mehta
                                                        United States District Judge